1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                         SAN JOSE DIVISION

11   BRETT JOHNSON,                    )   Case No.: 12-CV-03691-LHK
                                       )
12                    Plaintiff,       )
                                       )
          v.                           )   ORDER GRANTING DEFENDANTS'
13                                     )   MOTIONS FOR SUMMARY
     SAN BENITO COUNTY, et. al.,       )   JUDGMENT
14                                     )
                      Defendants.      )
15   _____ )

16          Plaintiff Brett Johnson ("Plaintiff") brings this action against Defendants San Benito

17   County, Patrick Turturici, and Tony Lamonica ("Defendants") for alleged violations of 42 U.S.C. §

18   1983. Before the Court are Defendants' Motions for Summary Judgment, which are fully briefed.

19   After considering the parties' submissions, the relevant law, and the record in this case, the Court

20   GRANTS Defendants' Motions for Summary Judgment.

21   **I.      BACKGROUND**

22        **A.      The Parties[1]**

23          Plaintiff Brett Johnson is a San Jose police officer and a father of four. ECF No. 50-1

24   ("Johnson Decl.") ¶¶ 13-16. He brings this case pursuant to 42 U.S.C. § 1983 against two San

25   Benito County Sheriff's Department Officers, Undersheriff Patrick Turturici and Sergeant Tony

26   Lamonica (collectively, "Officer Defendants"), along with the County of San Benito. ECF No. 1.

27

28   _____

[1] The Court presents the facts in the light most favorable to Plaintiff. *See In re Oracle Corp. Sec.
Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (holding that at summary judgment, all inferences must be
made in favor of the non-moving party).

                                                1

United States District Court
For the Northern District of California

Plaintiff alleges that Officer Defendants engaged in a conspiracy that resulted in the deprivation of Plaintiff's constitutional rights by leading to the filing of false charges against Plaintiff. *Id.* ¶¶ 38-45.

Plaintiff posits that the central feature of the conspiracy was a quid pro quo agreement between Turturici and Plaintiff's ex-wife's new husband, Mike Howard ("Mike"), a prominent local businessman. *Id.* ¶ 31. Under this agreement, Mike would support Turturici in his competitive election to become sheriff of San Benito County, and in exchange, Turturici would use his authority as Undersheriff to cook up a false charge of child abuse against Plaintiff. ECF No. 50 at 2-3. This false charge would benefit Mike, because it would have the effect of altering Plaintiff's child support agreement with Plaintiff's ex-wife Mary Howard ("Mary"). This change would allow Mary (and therefore Mike) to receive increased child support. *Id.* at 12. Another effect of this agreement, according to Plaintiff, was that it would adversely affect Plaintiff's career in law enforcement and Plaintiff's ability to maintain future familial relationships. *Id.* at 13.

Understanding the conspiracy that Plaintiff alleges requires a brief overview of the individuals who form its crucial links:

- **Undersheriff Turturici**: Turturici was running for sheriff at the time of the incident. ECF No. 1 ¶ 24. Turturici's campaign involved threats of adverse consequences to those who did not support him and promises of rewards to those who supported his campaign. ECF No. 50-2 ("Scott Decl."), Ex. 29. Turturici's campaign is central to the alleged conspiracy. Complaints regarding Turturici's conduct during the campaign led to an internal investigation, which found that "there have been legitimate and corroborated incidents of inappropriate behavior and misconduct on the part of Undersheriff Turturici." *Id.* at 37. Nevertheless, the investigation made no formal findings on any alleged wrongdoing. *Id.* at 38.

- **Sergeant Lamonica:** Lamonica, an officer in the Sheriff's Office, was a Turturici supporter and loyalist who had been promised a promotion if Turturici was elected sheriff. *Id.*; Scott Decl., Ex. 19 ("Williams Depo.") at 125.

- **Mary Howard:** Mary is Plaintiff's ex-wife. She began working for and then dating Mike Howard. Scott Decl, Ex. 22 ("Mary Depo.") at 63-65. This relationship matured into a cohabitative, and ultimately, marital relationship. *Id.* Mary and Plaintiff shared joint physical and legal custody of their four children, but that custody arrangement changed as a result of the conduct at issue in this case. Johnson Decl. ¶ 14.

- **Mike Howard:** Mike owns the Tres Pinos Inn, a popular local business in San Benito County. Mike Howard's father supported Turturici for Sheriff. Johnson Decl. ¶ 27. Mike himself, however, did not contribute to or support Turturici's campaign. ECF No. 42 ("Davis Decl."), Ex. D ("Mike Depo."), at 89. Mike and Turturici lived on the same street for a period of time and were randomly paired

2

United States District Court
For the Northern District of California

together during a charity golf tournament a half a decade ago. *Id.*; Scott Decl., Ex. 26 ("Turturici Depo.") at 152-54.

- **William Tiffany:** Tiffany is a lawyer with whom Mary consulted during her divorce from Plaintiff. Mary did not retain him at that time. Mary Depo. at 123-24. However, Mary did hire him shortly after the allegations that form the basis for this action. *Id.* at 125.

- **Dan Devries:** Devries is a local attorney and a friend of Mike Howard. Scott Decl., Ex. 24 ("Devries Depo.") at 10-14. He is involved in a number of community activities, including publication of a local newspaper. *Id.* at 16. He also has ties to Tiffany and Turturici. *Id.* at 17-19.

- **Karen Forcum:** Forcum is the deputy district attorney in San Benito County that prosecuted Plaintiff. Scott Decl., Ex. 21 ("Forcum Decl.") at 26.

### B.   Incident

This case results in large part from an incident on July 17, 2010, when Plaintiff and his youngest son, who was fourteen years old at the time, got into an argument that ultimately turned violent. Scott Decl., Ex. 2, at 1. On the day of the incident, Plaintiff's youngest son and youngest daughter were in Plaintiff's custody. *Id.* at 14. The youngest son refused to get out of bed to go run an errand. *Id.* As a result, Plaintiff and the son got into an argument. *Id.* Events became physical when Plaintiff grabbed his son's arm to pull the son out of bed. *Id.* The son then started flailing his arms. *Id.* at 18. As a result, Plaintiff told his son to stop, and when his son did not stop, Plaintiff pushed the son against the dresser in the room. *Id.* At this point, Plaintiff instructed his son to complete some chores outdoors. *Id.* Once outside, Plaintiff felt his son was not following instructions. *Id.* Plaintiff and his son began to argue again, and at that point, Plaintiff's son ran to a neighbor's house. *Id.*

Plaintiff was upset because the family was late to run the errand. His son, meanwhile, had asked the neighbor, Bob Coffert ("Bob"), whether he could use a phone to call his mother. *Id.* at 15. Bob agreed, and Plaintiff's son went into a small laundry room in the Coffert residence and called his mother. *Id.* At this point, Plaintiff was still back at Plaintiff's residence preparing his vehicle to run the errand. *Id.* at 18. After that task was complete, Plaintiff came to the Coffert residence to retrieve his son. *Id.*

At the Coffert residence, Plaintiff asked his son to hang up the telephone since they were running late. The son refused and stated that he would not accompany Plaintiff on the errand. *Id.* At this point, Plaintiff grabbed his son's arm, took the phone, and hung up. *Id.* Plaintiff's son resisted

Case No.:  12-CV-03691-LHK
ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

by dropping to the floor and laying limp. *Id.* Plaintiff put his son's arm behind his son's back in some sort of arm lock and placed his knee on his son's back. *Id.* at 15. Plaintiff finally picked his son up off the floor and carried him outside the door. *Id.* at 18. Plaintiff and his son continued to argue throughout this incident. *Id.* Once Plaintiff's son was in the passenger seat of the car, the son allegedly made derogatory comments about Plaintiff. *Id.*

At this point, the facts accounted by Plaintiff diverge from those accounted by his son. Plaintiff claims that he raised his hand to slap his son to punish the son for making the derogatory comment, but that before Plaintiff could do anything, his son moved his head and hit it against the window. *Id.* Plaintiff's son in contrast claims that Plaintiff slapped him with an open hand, despite the fact that the son was sitting mute because he did not want to speak to his father. *Id.* at 15. Plaintiff's son claims that the slap caused him pain because it hit a tooth, and that before his father slapped him, he noticed blood under his nose resulting from the scuffle inside the Coffert house. *Id.*

Both Plaintiff and his son agree that the remainder of the drive to run the errand was uneventful. After they returned home, Plaintiff asked his son to pack up the son's belongings and to return to his mother's residence. *Id.* Plaintiff's son did so, and Mary came and picked Plaintiff's son up from Plaintiff's residence. *Id.* Plaintiff's son told Mary about the physical altercation between Plaintiff and Plaintiff's son. *Id.* At this point, Mary called the San Benito County Sheriff's Office to report the incident. *Id.* at 14.

### C.      First Investigation

Deputy Marc Williams responded to the call, and he contacted his supervisor Sergeant Rick Uribe because the suspect, Plaintiff, was a police officer. Serverian Decl., Ex. F ("Williams Depo.") at 44-45. Uribe therefore joined Williams at Mary's residence. Scott Decl., Ex. 20 ("Uribe Depo.") at 40-41. Williams first interviewed Mary, who reported her family history and told Williams that the younger daughter was still with Plaintiff. Scott Decl., Ex. 2, at 14. Williams offered to request medical assistance for the son, but both Mary and the son refused. *Id.* Williams then interviewed the son, who reported his version of the incident. *Id.* at 14-16. Williams photographed the son's injuries, which included scratches and red marks on the son's body. *Id.* at 15. Williams instructed Mary that because of the existing custody order, Plaintiff could insist that

4

United States District Court
For the Northern District of California

the son be returned to Plaintiff and that the daughter not be released from Plaintiff's custody. *Id.* at 16. Accordingly, Williams recommended an emergency protective order ("EPO") to circumvent the custody arrangement. *Id.* Mary requested an EPO. *Id.* Williams called a judge and informed the judge of the circumstances. *Id.* The judge issued an EPO and ordered that Williams confiscate all of Plaintiff's firearms. *Id.*; Scott Decl., Ex. 1.

While Williams was interviewing Mary and Plaintiff's son, Uribe was supervising. Uribe Depo. at 42. Williams briefed Uribe, and Uribe asked if Williams had any questions. *Id.* at 41-42. While Williams' interviews were ongoing, Uribe engaged in a small-talk conversation with Mike about a trip Mike took to Idaho and Mike's forthcoming wedding. *Id.* at 42-44. Uribe and Mike did not have any preexisting familiarity with each other. *Id.* at 44. During this time, Uribe was also watching Williams interview Mary and Plaintiff's son. *Id.* at 45.

Williams and Uribe then interviewed Bob and Mary Lou Coffert ("Mary Lou"), Plaintiff's neighbors whose house was the scene of much of the incident. Mary Lou told the officers that she did not see any abusive conduct on Plaintiff's part. Scott Decl., Ex. 2, at 16. Bob stated that he had heard a lot of yelling between Plaintiff and his son, during this incident and at other times. *Id.* at 17. But Bob stated that he had never seen Plaintiff act abusively with regard to Plaintiff's son. *Id.*

Williams next interviewed Plaintiff and Plaintiff's youngest daughter (who was a witness to much of the incident and who was still with Plaintiff). Williams tape recorded his interview with Plaintiff, in which Plaintiff informed the officers that his son routinely acted emotionally and violently. *Id.* at 18-19; Uribe Depo. at 17. Plaintiff stated that his son had behavioral issues and that Plaintiff, rather than Mary, was the disciplinarian parent. Scott Decl., Ex. 2 at 19. Plaintiff further stated that his son had not reported any injuries resulting from the incident other than a tooth ache. *Id.* Plaintiff's younger daughter essentially corroborated Plaintiff's statement, and stated that she was not afraid of her father and that her father was not out of control when he was dealing with her brother. *Id.* at 20.

After interviewing all the parties, Williams contacted the judge who issued the EPO and asked the judge to suspend the EPO. *Id.* Williams offered two reasons for why he asked the judge to suspend the EPO. First, Williams stated that the injuries to Plaintiff's son resulted more from

United States District Court
For the Northern District of California

circumstance than intentional act and that as a result, Plaintiff was not going to be taken into custody. *Id.* Second, Williams stated that Plaintiff voluntarily agreed to suspend the custody arrangement and to allow Mary to maintain custody while the situation was resolved, thereby mooting the necessity of the EPO. *Id.* at 21. The judge declined to remove the EPO, but shortened its duration. *Id.*

In accordance with protocol, Williams drafted a report of his investigation of the incident, booked all seized firearms, completed a child abuse report form required by the state Department of Justice, in which he stated that the child abuse allegations were "inconclusive," and downloaded all digital photos into the Sheriff's Office case management system. *See generally id.* Williams' report recommended forwarding a copy of the report to the District Attorney's office and to Child Protected Services for those agencies' review. Plaintiff was not arrested, and no charges were filed. *Id.* at 21.

### D.       Follow-Up Investigation, Charge, and Resolution

A day or two after the incident, Mike and Mary got in touch with Turturici at the Sheriff's Office to discuss the case. It is not clear who—Mike, Mary, or Turturici—made the initial call, but it is apparent that Mary ended up talking to Turturici.[2] In this conversation, Mary explained that she was concerned that the allegations against Plaintiff were not being taken as seriously as they should have been, perhaps because Plaintiff was a police officer. Mary Depo. at 101-04. After speaking with Mary, Turturici asked Lamonica to follow up on the case. Turturici Depo. at 86.

Lamonica reviewed Williams' report from the initial investigation and concluded that further investigation was necessary. Lamonica Depo. at 88. Accordingly, Lamonica re-interviewed Plaintiff's youngest son, who was injured in the incident, and Plaintiff's youngest daughter, who was a witness to the incident. *Id.* He also interviewed Plaintiff's two older children, who had no part in the incident, to determine whether there was any family history relevant to the incident. *Id.* Lamonica did not, however, re-interview Plaintiff himself, nor did he review the audio recording of

---

[2] In her deposition, Mary could not clearly recall who called whom. Mary Depo. 96-100. It appears that Mike either called Turturici or got Turturici's contact information from the sheriff. At that point, either Mary called Turturici or Turturici called Mary.

Case No.:  12-CV-03691-LHK
ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

the initial interview with Plaintiff. *Id.* at 90-91. Rather, he relied exclusively on Williams' report for information about the initial interview.

Lamonica prepared a supplemental report.[3] Lamonica also changed Williams' DOJ child abuse report from "inconclusive" to "substantiated." *Id.* at 122. Lamonica then forwarded both the supplemental report and the revised DOJ child abuse report form to the District Attorney's office. *Id.* There is no evidence in the record that Turturici either told Lamonica how to conduct the investigation or otherwise participated in Lamonica's investigation. Johnson Depo. at 206 (acknowledging the lack of evidence of Turturici's involvement in the investigation beyond referral to Lamonica).

Forcum, the Deputy District Attorney in charge of the case, received Williams' initial report and Lamonica's supplemental report. Forcum Depo. at 34-37. Forcum further consulted with the San Benito County Health and Human Services Agency. *Id.* at 36-37. An official at that agency, after interviewing Plaintiff's youngest son and youngest daughter, concluded that "the father is not guilty of physical abuse or emotional abuse as defined in the Welfare and Institutions Code." ECF No. 50-7. Nevertheless, having reviewed the officers' reports, Forcum prepared and filed a criminal complaint. Forcum Depo. at 43. Forcum contends that she did not rely on the DOJ child abuse report form or on the audio recording of Williams' interview with Plaintiff in filing criminal charges. *Id.* at 49, 51.

Plaintiff was arraigned. *Id.* at 54. He and his counsel were provided case materials prepared by Officer Defendants and other San Benito Sheriff's Office employees. Johnson Depo. at 94. As part of this material, Plaintiff was provided with a recording of Williams' interview with Plaintiff. Forcum Depo. at 49. After reviewing these materials, Plaintiff agreed to attend a three-month parenting class in exchange for the prosecutors' dropping of charges against him. Johnson Depo. at 97. Pursuant to this agreement, Plaintiff attended the classes, and the charges were dropped. Forcum Depo. at 54-55.

After the charges were dropped, Plaintiff filed an internal affairs complaint against Defendants alleging that the recording of Williams' interview with Plaintiff had been manipulated.

---

[3] A full version of this report is not in the record. *See* Scott Decl., Ex. 8 (first page of the report).

Scott Decl., Ex. 13. Plaintiff submitted an expert report, which found irregularities in the recording. Scott Decl., Ex. 14. Plaintiff contends that someone altered the recording to eliminate exculpatory information. Scott Decl., Ex. 13 at 5. The state Department of Justice investigated Plaintiff's claim and concluded that the recording had not been tampered with. Serverian Decl., Ex. H. Defendants also retained another forensics expert, who like the state agency, concluded that there was no evidence that the recording had been manipulated. Serverian Decl., Ex. I.

### E.    Consequences

Plaintiff contends that he has suffered adverse consequences resulting from the actions of Officer Defendants in this case. Specifically, he contends that the charges in this case negatively affected his current and future familial relationships and his career prospects.

With respect to his family, Plaintiff contends that a lawyer for his ex-wife Mary, William Tiffany, sent him a letter during the pendency of the investigation in this case. Scott Decl., Ex. 7. In that letter, which was sent four days after the incident, Tiffany stated that Mary objected to Plaintiff having unsupervised visitation during a specific ten-day period with Plaintiff's youngest son due to the allegations in this case. *Id.* The record does not contain any evidence that this letter permanently affected Plaintiff's custody and visitation arrangement with Mary, and, in fact, with respect to Plaintiff's youngest daughter, the custody arrangement has proceeded unchanged. Johnson Depo. at 17.

Plaintiff further notes that he received paperwork from Child Support Services, indicating that Plaintiff was responsible for more child support. Johnson Depo. at 132. Child Support Services indicated that Plaintiff was responsible for the increased sum of child support because his youngest son was now living full-time with Mary. *Id.* at 133. Plaintiff did not hire a lawyer or challenge this new arrangement in family court; rather, he stipulated to the increase in the support payments. *Id.* at 132, 135. Importantly, further, there is no evidence that changes to the custody agreement were mandated by Defendants' actions in this case.

Plaintiff also contends that the events in this case have led to a longer term negative impact on his ability to establish and maintain familial relationships. Specifically, Plaintiff has been placed on the California Department of Justice's Child Abuse Central Index ("CACI") for having a

Case No.:  12-CV-03691-LHK
ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

"substantiated" incidence of child abuse. Scott Decl., Ex. 9. Plaintiff claims that this placement could adversely affect his ability to serve as a foster, step, or adoptive parent. Johnson Decl. ¶ 31. Specifically, the San Benito County Sheriff's Office, in a letter to Plaintiff explaining Plaintiff's Placement on CACI, stated that the "Index is accessed by law enforcement agencies, probation departments, county welfare agencies and district attorneys when conducting investigation of child abuse, and court investigators and licensing agency personnel to screen individuals for child placement and licensure or employment positions having custody of children." Scott Decl., Ex. 9.

With respect to his career, Plaintiff contends that he was placed on the *Brady* list by the Santa Clara County District Attorney's Office for having engaged in conduct that involved moral turpitude. Scott Decl., Ex. 15. While Plaintiff contends that his placement on the *Brady* list could adversely affect his career, including, for example, whether prosecutors are likely to allow him to take the stand in cases that he investigates, there is no admissible evidence in the record explaining the effect of being placed on the *Brady* list. Johnson Decl. ¶ 30. In his deposition, Plaintiff further testified that he has suffered no actual adverse effects in his current job as a result of Defendants' actions in this case. Johnson Depo. at 63.

## F.     The Instant Litigation

In light of these consequences, Plaintiff filed the instant lawsuit against San Benito County, Turturici, and Lamonica. In his original Complaint filed on July 13, 2012, Plaintiff pleaded four 42 U.S.C. § 1983 causes of action, all of which were based on allegations of conspiracy to deprive Plaintiff of his constitutional rights. ECF No. 1 at ¶¶ 38-53. Specifically, in his original complaint, Plaintiff alleged that Defendants conspired to retaliate against Plaintiff in violation of the Fourteenth Amendment, conspired to deprive Plaintiff of his equal protection rights by placing him in a "class of one," and conspired to cause a bad faith arrest that violated Defendants Fourth Amendment rights. *Id.* ¶¶ 38-48. Plaintiff further alleged that San Benito County was liable because it ratified Officer Defendants' conduct. *Id.* ¶¶ 49-53.

On March 1, 2013, Plaintiff filed an amended complaint, which alleges five causes of action under 42 U.S.C. § 1983. ECF No. 19. First, Plaintiff alleges that Defendants violated his Fourteenth Amendment rights to due process by causing criminal charges to be filed against him.

*Id.* ¶¶ 39-42. Second, Plaintiff alleges that Defendants violated his equal protection rights. *Id.* ¶¶ 43-46. Third, Plaintiff alleges that Defendants violated the Fourth Amendment by causing a bad faith arrest. *Id.* ¶¶ 47-49. Fourth, Plaintiff alleges that Defendants violated the First Amendment by engaging in conduct designed to chill Plaintiff's rights to free speech and to petition the family court. *Id.* ¶¶ 50-55. Fifth, Plaintiff alleges municipal liability on the basis that San Benito County ratified Officer Defendants' conduct. *Id.* ¶¶ 56-60. The Amended Complaint further alleged that Officer Defendants were motivated by a conspiracy to deprive Plaintiff of his constitutional rights, but did not plead any conspiracy causes of action explicitly. *Id.* ¶¶ 42, 46, 49, 55.

On September 26, 2013, after the close of discovery, Turturici filed his Motion for Summary Judgment. *See* ECF No. 40. That same day, San Benito County and Lamonica filed a separate joint Motion for Summary Judgment. *See* ECF No. 43.[4] On October 15, 2013, Plaintiff filed oppositions to both motions. *See* ECF Nos. 50-51.[5] On October 22, 2013, Turturici filed a reply. *See* ECF No. 59. Lamonica and San Benito County also filed a reply that same day. *See* ECF

---

[4] Both sets of Defendants also filed declarations and exhibits accompanying their Motions for Summary Judgment. Both sets of Defendants discovered that some of these exhibits contained sensitive information and move to remove these incorrectly filed documents from the docket. ECF Nos. 54-55. Plaintiff does not oppose this request, and Defendants have filed replacement exhibits. ECF Nos. 53, 57, 58. The Court GRANTS the motions to remove these documents. ECF Nos. 42-8, 42-10, 44. These entries shall remain locked. The Court has only considered the replacement exhibits in ruling on the Motions for Summary Judgment. *See* ECF Nos. 53, 57, 58.

[5] Plaintiff has filed two Administrative Motions to File Under Seal parts of Plaintiff's opposition to Defendants' Motions for Summary Judgment and one exhibit to the Declaration of John Houston Scott in support of Plaintiff's opposition. ECF Nos. 49, 52. The Court GRANTS Plaintiff's request to seal the exhibit attached to the Scott Declaration, which is the Internal Affairs Investigation Report. Scott Decl., Ex. 29. This Court finds that "compelling reasons" support the sealing of this document, which is a report on a non-public, internal employment investigation, much of which is not specifically relevant to the instant litigation. *See Kamakana v. City and Cnty. of Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006). Plaintiff shall e-file Exhibit 29 to the Scott Declaration under seal.

The Court DENIES Plaintiff's request to seal parts of his opposition. The information in the sentences that Plaintiff seeks to redact has already been publicly disclosed in this litigation. *See* ECF Nos. 26, 27, 29. The redacted portions of the opposition merely refer to the existence of the investigation and the broad outlines of what was investigated. *See* ECF No. 29 (explaining the relevance of these documents). The only specific findings of the investigation revealed in the opposition are directly related to the issues in these dispositive motions. Plaintiff has failed to set forth "compelling reasons" to seal this information. Accordingly, the Court finds that these are not sealable. Within five days of this order, Plaintiff shall e-file an unredacted version of the opposition. *See* ECF No. 51.

No. 60.

## II.      LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323.

At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party, and all reasonable inferences that may be drawn from the facts placed before a court must be drawn in favor of the opposing party. *See Stegall v. Citadel Broad., Inc.*, 350 F.3d 1061, 1065 (9th Cir. 2003). If evidence produced by the moving party conflicts with evidence produced by the nonmoving party, a court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). However, "[b]ald assertions that genuine issues of material fact exist are insufficient." *See Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v. Sears Holdings Corp.*, No. 11-09068, 2013 WL 1010547, at *4 (C.D. Cal. Mar. 13, 2013) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" *Anderson*, 477 U.S. at 249-50; *see also Hardage v. CBS Broad. Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2006) (same). If the

Case No.:  12-CV-03691-LHK
ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

nonmoving party fails to produce evidence sufficient to create a genuine dispute of material fact, the moving party is entitled to summary judgment. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

## III.    DISCUSSION

### A.    Officer Defendants' Liability

Plaintiff alleges that Officer Defendants deprived him of his First, Fourth, and Fourteenth Amendment rights and engaged in a conspiracy, the goal of which was to effectuate these deprivations. Specifically, in his opposition to the instant motions, Plaintiff contends that Officer Defendants contravened their constitutional obligations by conspiring to engage in conscience-shocking actions that (1) deprived Plaintiff of his substantive due process rights to pursue a career and engage in familial relationships, (2) deprived Plaintiff of his due process right to be free from the use of tampered evidence, (3) resulted in a bad faith seizure in violation of the Fourth Amendment, and (4) constituted retaliation that chilled Plaintiff's First Amendment rights of association and his right to petition the family court.[6] ECF No. 51 at 19-22.

Officer Defendants' principal contention in the instant motions is that they are entitled to qualified immunity. "An officer is entitled to qualified immunity unless (1) facts viewed in the light most favorable to the injured party show that the officer violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Ford v. City of Yakima,* 706 F.3d 1188, 1192 (9th Cir. 2013). The inquiry focuses on whether Officer Defendants acted unreasonably—not whether they acted with malicious intent. As the Supreme Court has stated, "an allegation of malice is not sufficient to defeat immunity if the defendant acted in an objectively reasonable manner." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

---

[6] Although Plaintiff's Amended Complaint alleges an equal protection violation, neither Defendants' motions or replies nor Plaintiff's opposition address this cause of action. The Court notes that the equal protection claim would be meritless even if the claim had been properly argued in the briefs because Plaintiff has not marshaled any facts to suggest that those similarly situated to him were treated differently. *See McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004) ("A class of one equal protection claim may be brought where (1) the plaintiff alleges that he has been intentionally treated differently from others similarly situated and (2) that there is no rational basis for the difference in treatment or the cause of the differential treatment is a 'totally illegitimate animus' toward the plaintiff by the defendant.").

12

For the reasons stated below, the Court here finds that the Officer Defendants are entitled to qualified immunity because the facts, even when viewed in the light most favorable to Plaintiff, do not show that Officer Defendants violated any of Plaintiff's constitutional rights. Accordingly, the Court need not reach the issue of whether such rights were clearly established at the time of the misconduct.

Before the Court turns to each of Plaintiff's alleged constitutional violations to explain why these theories are not supported by the record, the Court notes the narrowness of Plaintiff's claims. Plaintiff only alleges wrongdoing by Turturici and Lamonica. It is undisputed that Turturici's sole action in the investigation that led to the instant litigation was asking Lamonica to conduct a second investigation. Johnson Depo. at 206, 211 (acknowledging lack of evidence regarding any further involvement by Turturici). Lamonica's role, while slightly more expansive, was also minimal. He re-interviewed Mary and Plaintiff's children, reviewed the first investigation, changed the designation of child abuse from "inconclusive" to "substantiated," and forwarded his revised report to the district attorney's office. Therefore, the crux of Plaintiff's case is a challenge to the fact that the case was re-investigated and a challenge to how that investigation was conducted.

The Court now turns to each of the bases on which Plaintiff contends that Officer Defendants' investigation infringed Plaintiff's constitutional rights. For the reasons discussed below, the Court finds that the facts in the light most favorable to Plaintiff do not show that Officer Defendants violated Plaintiff's constitutional rights.[7] Accordingly, the Court grants summary judgment on the first prong of the qualified immunity analysis.[8]

### 1.      Substantive Due Process

---

[7] Because the Court finds that there is no underlying constitutional violation, Plaintiff's conspiracy allegations necessarily fail. As the Ninth Circuit has held, "[c]onspiracy is not itself a constitutional tort under § 1983," and conspiracy "does not enlarge the nature of the claims asserted by the plaintiff, as there must always be an underlying constitutional violation." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 935 (9th Cir. 2012). The Court's finding that there is no constitutional violation therefore necessarily means that there is no claim for conspiracy.

[8] Because the Court grants summary judgment on qualified immunity grounds, it need not reach Defendants' alternate contention that Plaintiff's claims are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994).

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"Substantive due process protects individuals from arbitrary deprivation of their liberty by government." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006). The Ninth Circuit has stated that "to establish a constitutional violation based on substantive due process, [a plaintiff] must show both a deprivation of her liberty *and* conscience-shocking behavior by the government." *Id.* (emphasis added). For the reasons set forth below, the Court finds that Plaintiff has not marshaled facts on the second of these two elements, whether Officer Defendants engaged in conscience-shocking behavior. Accordingly, the Court need not reach the issue of whether there is sufficient evidence to demonstrate that Officer Defendants deprived Plaintiff of constitutionally protected liberty interests.

The Supreme Court has stated that "only the most egregious official conduct can be said to be arbitrary in a constitutional way." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). That inquiry requires the Court to look at whether Officer Defendants engaged in "conduct intended to injure in some way *unjustifiable by any government interest*." *Id.* at 849 (emphasis added). Here, for the reasons stated below, the Court finds that there is no evidence that Officer Defendants intended to injure Plaintiff in a manner that is unjustifiable by any government interests. In fact, the evidence in the record suggests that Officer Defendants acted reasonably in the course of their employment. As the Ninth Circuit has noted, where defendants act reasonably, their actions cannot violate the more stringent shocks-the-conscience standard for a substantive due process violation. *See Moreland v. Las Vegas Metropolitan Police Dept.*, 159 F.3d 365, 371 n. 4 (9th Cir. 1998) (noting that if defendants' "actions were objectively reasonable, it follows that [their] conduct did not offend the more stringent standard applicable to substantive due process claims.").

The undisputed facts suggest that Officer Defendants acted reasonably and that therefore their conduct did not, as a matter of law, shock the conscience. Specifically, Turturici received a call from a concerned mother, Mary, that allegations of child abuse were not being taken seriously. Mary Depo. at 101-04. In response, Turturici asked Lamonica to take a second look at the case. Turturici Depo. at 86. Lamonica reviewed the documents prepared in the scope of the first investigation; conducted additional investigations that, in his experience, were warranted; and

14

reached the conclusion that Plaintiff engaged in unlawful conduct. Lamonica Depo. at 88. That Lamonica reached a conclusion different than that reached by Williams after Williams' initial investigation does not render Lamonica or Turturici's conduct unreasonable. A reasonable officer could conclude from the facts of the incident and from Plaintiff's son's resulting injuries that there was a substantiated claim of child abuse. This is all substantive due process requires. Plaintiff's contention that Turturici and Lamonica's improper motives (*i.e.*, appeasing Mike to garner support for Turturici's campaign) led to the conclusion that the child abuse allegations were substantiated is immaterial. *Brittain*, 451 F.3d at 998. The critical question is not what motivated Turturici and Lamonica in their conduct; rather, the question is whether such conduct was reasonable. *See id.* Because the Court here concludes that Officer Defendants' conduct was reasonable, it need not inquire into their motives. Instead, the finding of reasonableness is sufficient to conclude, as a matter of law, that Officer Defendants cannot be liable for violation of Plaintiff's substantive due process rights.

        In finding as a matter of law that Officer Defendants did not act in an unreasonable manner free from any legitimate government process, this Court finds that this case bears substantial similarity to the Ninth Circuit's decision in *Brittain*. In *Brittain*, the Ninth Circuit, rejecting a substantive due process challenge, granted summary judgment to a police officer on qualified immunity grounds. There, the officer responded to a dispute between ex-spouses about which spouse was entitled to custody at that moment. 451 F.3d at 986. The officer, after interviewing the mother and reviewing the ambiguous custody agreement, ordered that the mother release the child to the father. *Id.* at 986-87. The Ninth Circuit held that there the officer did not, as a matter of law, engage in any conscience-shocking behavior. *Id.* at 996-97. The Ninth Circuit, after finding that the officer's actions were a reasonable exercise of his statutory duties, found that the plaintiff's evidence that the officer conspired with plaintiff's ex-husband was immaterial to its analysis of whether the officer's conduct was conscience-shocking. *Id.* at 998. The Ninth Circuit stated that the "conspiracy allegations all amount to issues of intent, which while disputed, are not relevant" to the question of whether an officer's conduct shocks the conscience. *Id.* The Ninth Circuit similarly found that plaintiff's evidence that defendant turned the tape recorder on and off while he was

15

interviewing plaintiff was irrelevant. *Id.* Finally, the Ninth Circuit rejected plaintiff's contention that defendant's deviation from the usual practice of not requiring immediate transfer when there was a custody dispute was immaterial to whether the officer's conduct shocked the conscience. *Id.* The Ninth Circuit stated, "[i]t is not conscience shocking that an officer would act in a non-identical fashion in cases presenting similar (though not identical) factual circumstances." *Id.*

Plaintiff's contentions that Officer Defendants engaged in conscience-shocking activities in this case are strikingly similar to those rejected by the Ninth Circuit in *Brittain*. Plaintiff contends, for example, that Mike and Mary conspired with Turturici and Lamonica to create the charges that ultimately adversely affected Plaintiff's career and familial relationships. Yet, this is the precise theory of conscience-shocking activity that the Ninth Circuit rejected in *Brittain*. *Id.* at 998. So long as Turturici and Lamonica acted reasonably as law enforcement officers, their ill motives are immaterial to whether their conduct shocked the conscience. Furthermore, Plaintiff appears to contend that under the usual policies of the San Benito County Sheriff's Office, an officer would not re-interview a witness without consulting the officer that did the initial report. Plaintiff asks the Court to infer that Officer Defendants engaged in conscience-shocking conduct from Lamonica's failure to follow this process by failing to consult with Williams before Lamonica's interview of Mary, Plaintiff's youngest son, and Plaintiff's youngest daughter. ECF No. 50 at 11. Yet, as discussed above, the Ninth Circuit has held that evidence of a deviation from routine practice or policy is insufficient to survive a summary judgment motion. *Brittain,* 451 F.3d at 998. Finally, Plaintiff here contends that the evidence of the tampering of the recording of Williams' interview with Plaintiff is also probative of whether Officer Defendants engaged in conscience-shocking behavior. As a preliminary matter, the record is not clear that Officer Defendants (or Forcum, the prosecutor) actually relied upon the audio recording in making their decisions regarding prosecution, or placement of Plaintiff on CACI and *Brady* lists. Furthermore, the Ninth Circuit in *Brittain* held that manipulation of evidence cannot establish conscience-shocking activity, so long as the officer acted reasonably. *Id.* Accordingly, Plaintiffs' contentions with respect to whether Defendants acted in a manner that would shock the conscience are insufficient to create a genuine issue of material fact on whether there was a substantive due process violation.

16

United States District Court
For the Northern District of California

2.      **Tampered Evidence**

Plaintiff next contends that Officer Defendants' actions deprived him of his right to be free from the use of tampered evidence. Specifically, Plaintiff contends that the altered recordings of Williams' interview with Plaintiff led to the filing of criminal charges against Plaintiff. "[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001). To support a deliberate fabrication of evidence claim, Plaintiff "must, *at a minimum*, point to evidence that supports at least one of the following two propositions: (1) Defendants continued their investigation of [Plaintiff] despite the fact that they knew or should have known that he was innocent; or (2) Defendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Id.* at 1076 (emphasis in original); *accord Gantt v. City of Los Angeles,* 717 F.3d 702, 707 (9th Cir. 2013). To prove a deliberate fabrication of evidence claim, a plaintiff must show that the tampering caused harm to the plaintiff.  *See McSherry v. City of Long Beach*, 583 F.3d 1129, 1136-47 (9th Cir. 2009). As such, if the ultimate decisions that caused Plaintiff harm were unrelated to the allegedly tampered evidence, then Plaintiff has no actionable section 1983 claim against those who tampered with the evidence. *Id.* at 1142. There must be facts that Officer Defendants relied on the tampered evidence and not on independent evidence in making their decisions that adversely affected Plaintiff.  *Id.* at 1146-47.[9]

This record lacks such evidence. Even if there had been tampering with the recording of Plaintiff's interview with Williams, there are no facts that suggest that the tampered evidence led to any adverse consequences for the Plaintiff. Plaintiff contends that Officer Defendants' actions put Plaintiff on the *Brady* List, altered his CACI designation from "inconclusive" to "substantiated," and led to his booking and charge for child abuse. ECF No. 51 at 12-15. Yet, there is no factual evidence in the record that Officer Defendants reviewed the allegedly tampered audio tape before

---

[9] The Ninth Circuit has also held that a defendant's conduct must shock the conscience for a plaintiff to bring a deliberate fabrication of evidence claim. *See Gantt,* 717 F.3d at 707. Therefore, the Court's discussion above with respect to Plaintiff's failure, as a matter of law, to establish that Defendants' conduct shocked the conscience also proves fatal to Plaintiff's deliberate fabrication of evidence claim.

Case No.:  12-CV-03691-LHK
ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

taking these actions. To the contrary, Lamonica, the Defendant who conducted the second investigation, testified that he never reviewed the audio recording of Williams' interview with Plaintiff. Lamonica Depo. at 91 ("Q: Did you listen to that interview? A: No, I did not."). Furthermore, Forcum, the prosecutor who made the decision to press forward with the criminal charges against Johnson, also did not review this tape, but rather relied on her own separate investigation. Forcum Depo. at 49 ("Q: Did you ever listen to the tape? A: No, I had a very -- I relied on the police report, which had the statements of the witnesses in the report."). This evidence is undisputed. Plaintiff has presented no facts to suggest that the purportedly doctored recording was used in any way, by Defendants, Forcum, or anyone else. *McSherry*, 584 F.3d at 1146-47 ("The record is devoid of any information, facts, or valid inferences that might undermine [the testimony that the tampered evidence was not relied upon].").

In light of the fact that the record is devoid of evidence of a causal nexus between the tampering of the evidence and any of the tangible harms Plaintiff purportedly suffered, the Court finds that Plaintiff's tampering of evidence claim cannot be a valid basis on which to proceed on a due process claim.

### 3. Bad Faith Seizure

Plaintiff claims that Officer Defendants engaged in a bad faith seizure through a false arrest. ECF No. 51 at 21. Specifically, Plaintiff appears to contend that Officer Defendants' investigation led to the improper arrest and booking of Plaintiff. *Id.* An arrest need only be supported by probable cause to be constitutional under the Fourth Amendment. *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979). Probable cause determinations are wholly objective and are based on the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 230-31 (1983). Accordingly, an individual officer's state of mind or intent is irrelevant to whether there was probable cause. *See Wren v. United States*, 517 U.S. 806 (1996).

In this case, the Court finds, as a matter of law, that there was probable cause to arrest and charge Plaintiff for child abuse. A reasonable officer could have concluded that Plaintiff engaged in conduct that would constitute child abuse. The California statute that Plaintiff was alleged to have violated states that "[a]ny person who willfully inflicts upon a child any cruel or inhuman

18

corporal punishment or an injury resulting in a traumatic condition is guilty." Cal. Penal Code. § 273d(a); Scott Decl., Ex. 10. In this case, there was sufficient evidence for a reasonable officer to conclude that Plaintiff had violated this statute. Specifically, there is no dispute that Plaintiff and his son were engaged in a physical, violent encounter. Scott Decl., Ex. 2. This encounter involved Plaintiff pushing his son into a dresser, pinning down his son with his knee placed on his son's back while holding his son's arm behind his son's back, and slapping or threatening to slap his son. *Id.* at 15, 18; ECF No. 50-7 (Stipulated Fact). Further, there is no dispute that Plaintiff's son was injured, including sustaining scratches and small red marks on his body resulting from the incident. Scott Decl., Ex. 2, at 15; Scott Decl., Ex. 4; Williams Depo. at 50-51. In light of these facts, the Court finds that a reasonable officer would have had probable cause to conclude that Plaintiff had violated California law.

### 4.    First Amendment

Plaintiff's final theory of constitutional violation is that Turturici and Lamonica's actions chilled Plaintiff's First Amendment right to associate and petition the family court. ECF No. 51 at 21-22. Plaintiff must demonstrate two elements to show that Officer Defendants violated his First Amendment rights: first, Plaintiff's "evidence must demonstrate that the officers' conduct would chill a person of ordinary firmness from future First Amendment activity" and second, "the evidence must enable [Plaintiff] ultimately to prove that the officers' desire to chill his speech was a but-for cause of their allegedly unlawful conduct." *Ford v. City of Yakima,* 706 F.3d 1188, 1193 (9th Cir. 2013).

In this case, the Court finds that the evidence is insufficient for Plaintiff to ultimately establish the second element, that the desire to chill speech was the but-for cause of Officer Defendants' actions. As a preliminary matter, the Court notes that in the cases in which the Ninth Circuit has found summary judgment inappropriate on a First Amendment theory, defendants have taken action in response to plaintiffs' engaging in First Amendment activity. *See id.; Lacey,* 693 F.3d at 917; *Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1314 (9th Cir. 1989). In contrast, in this case, Plaintiff does not contend that he was engaging in any sort of First Amendment activity before Officer Defendants engaged in their allegedly unlawful actions. Rather, Plaintiff's theory

19

focuses solely on the impact of Officer Defendants' actions on Plaintiff's future First Amendment activity.

The record is devoid of evidence from which a fact-finder could infer that preventing Plaintiff from petitioning the family court was a but-for cause of Officer Defendants' investigation of Plaintiff. *See Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009). There is no evidence that Officer Defendants knew of the details of Plaintiff's custody arrangement with Mary or had any desire to affect Plaintiff's rights to petition the family court to modify that arrangement. The only link that Plaintiff suggests is that Mike and Mary Howard communicated information about their financial status and custody arrangement to Officer Defendants. ECF No. 51 at 9-12. Yet, there is no evidence that Mike or Mary communicated this information to Officer Defendants. In fact, Mike has testified that he did not even know the nature of Mary's custody arrangement with Plaintiff. Mike Depo. at 106. Because there is no record evidence that Officer Defendants even knew about the custody arrangement, the Court finds that Officer Defendants could not have undertaken the actions in this case for the purpose of preventing Plaintiff from vindicating his right to petition the court regarding the custody arrangement.[10] Therefore, the Court finds that Plaintiff's First Amendment theory fails as a matter of law.[11]

### B.     The County's Liability

Plaintiff further contends that San Benito County is liable for the actions of Turturici and Lamonica under the *Monell v. Department of Social Service of City of New York,* 436 U.S. 658 (1978), because the County ratified the actions of the Officer Defendants. *See* ECF No. 1 at ¶¶ 49-53. The Court, however, need not address the question of whether municipal liability is appropriate

---

[10] Plaintiff was not ultimately deterred from petitioning the family courts. In fact, Plaintiff stipulated to the increase in his child support after he concluded that the increased amount was reasonable. Johnson Depo. at 134-35. While this fact is not dispositive, since the ultimate question is whether Officer Defendants' conduct would have chilled a person of ordinary firmness from First Amendment activity, *see Mendocino Envtl. Ctr.*, 192 F.3d at 1300, the Court nevertheless finds this fact relevant.

[11] In addition, summary judgment is also appropriate because the absence of probable cause is an essential element of a First Amendment retaliatory prosecution claim. *See Hartman v. Moore*, 547 U.S. 250 (2006). As discussed above, there was probable cause for the arrest and prosecution here. Accordingly, Plaintiff's First Amendment retaliation claim would fail even if he could establish but-for causation.

20

here under a ratification theory because the Court concludes that there are no facts supporting the contention that Turturici or Lamonica violated Plaintiff's constitutional rights.[12] *See Forrett v. Richardson*, 112 F.3d 416, 421 (9th Cir. 1997) ("Because we conclude that the officers did not violate [plaintiff's] constitutional rights, neither [the police chief] nor the City can be liable under section 1983."). Accordingly, the Court concludes that the County, like Officer Defendants, is entitled to summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motions for Summary Judgment.

**IT IS SO ORDERED.**

Dated:  December 3, 2013

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

---

[12] Nevertheless, Plaintiff has not pointed to any facts in the record that establish that the actions of Turturici and Lamonica were ratified by an official with final policymaking authority (*i.e.*, the person who, as a matter of state law, had final policymaking authority and whose acts may fairly be said to represent official policy in the area of decision). *See Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 985 (9th Cir. 2002). At best, Plaintiff has contended that Turturici himself had significant authority due to the particularities of the Sheriff's Office. The Court finds that the record is devoid of facts to support this theory.

21

Case No.:  12-CV-03691-LHK
ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT